# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**ALICE WELLS**
> **Plaintiff,**

**v.**                                                    **Case No. 07-C-940**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
> **Defendant.**

---

## <u>DECISION AND ORDER</u>

In October 1994, plaintiff Alice Wells applied for disability insurance benefits ("DIB") and supplemental security income ("SSI"), claiming that she was unable to work due to back pain and mental impairments. (Tr. at 30-36; 58.) The Social Security Administration ("SSA") denied the claim initially and on reconsideration (Tr. at 36-52), as did Administrative Law Judge ("ALJ") Robert Bartelt after a hearing in a decision dated February 12, 1997 (Tr. at 13-19). The SSA's Appeals Council denied plaintiff's request for review (Tr. at 4), but on plaintiff's action for judicial review under 42 U.S.C. § 405(g) another judge of this district court granted the parties' joint motion for a sentence six remand (Tr. at 506-07).[1] On receipt of the court's remand order, the Appeals Council vacated the ALJ's decision and remanded for further proceedings. (Tr. at 510-11; 516-17.)

On November 23, 1999, plaintiff appeared for another hearing before ALJ Bartelt (Tr. at 444; 449; 790), who issued another unfavorable decision on February 8, 2000 (Tr. at 405-43;

---

[1]The request was based on the fact that plaintiff's letter brief in support of the request for Appeals Council review was not associated with the file or considered by the Council. (Tr. at 505-06.)

850-88). This time, plaintiff obtained a remand from the Appeals Council dated May 12, 2001. (Tr. at 397-401; 940-44.) On remand, a new ALJ, Margaret O'Grady, held a third hearing on December 5, 2002, then issued yet another unfavorable decision on September 22, 2003 (Tr. at 375-88; 1053-66). The Council refused to take the case on this round, but on § 405(g) review the parties once again agreed to a remand, this time under sentence four, and the court entered judgment in plaintiff's favor and remanded the case on May 13, 2004. (Tr. at 1067-69.)

On October 14, 2005, plaintiff appeared for still another hearing before ALJ O'Grady (Tr. at 1411; 1433), who denied the claim again on January 20, 2006 (Tr. at 1042-50). The Council denied review on April 28, 2006 (Tr. at 1031), making ALJ O'Grady's January 2006 decision the final decision of the SSA. See Ketelboeter v. Astrue, No. 07-3272, 2008 WL 5205816, at *4 (7th Cir. Dec. 15, 2008). Plaintiff again seeks judicial review pursuant to § 405(g). Because plaintiff succeeded in obtaining SSI benefits as of March 2000 pursuant to a subsequent application (Tr. at 1015-19; see also Tr. at 1072-74; 1078-102), the period of alleged disability at issue in the case now runs from October 1994 to February 2000.

## I. APPLICABLE LEGAL STANDARDS

### A. Judicial Review

Judicial review under § 405(g) is limited to determining whether the ALJ's decision is supported by "substantial evidence" and free of harmful legal error. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. Berger v. Astrue, 516 F.3d 539, 544 (7th Cir. 2008) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). Thus, where conflicting evidence would allow reasonable minds to differ as to whether a claimant is

2

disabled, the responsibility for that decision falls on the ALJ.  Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).  The reviewing court may not re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  Rice v. Barnhart, 384 F.3d 363, 369 (7th Cir. 2004).  And, while the ALJ must build an accurate and logical bridge from the evidence to the conclusion, the court must give her opinion a commonsensical reading rather than nitpicking at it.  Id.

## B.    Disability Standard

The SSA has adopted a sequential five-step process for determining disability.  First, the ALJ must determine whether the claimant is working.  Second, if not, the ALJ determines whether the claimant has a severe mental or physical impairment, i.e. one that significantly limits her physical or mental ability to do basic work activities.  Third, if so, the ALJ determines whether the impairment meets or equals any of the presumptively disabling conditions found in the "Listings."  If so, the claimant is deemed disabled without further consideration of her ability to work.  If not, the ALJ must determine the claimant's residual functional capacity ("RFC") for work.  If the ALJ finds at step four that the claimant's RFC does not allow her to perform her past work, the burden shifts to the SSA to prove at step five that in light of the claimant's age, education, job experience and functional capacity, the claimant is capable of performing other work that exists in the national economy.  Skinner v. Astrue, 478 F.3d 836, 844 n.1 (7th Cir. 2007).

At step five, the ALJ may either rely on the "Grid," a chart that classifies a person as disabled or not disabled based on her exertional ability, age, education and work experience, or summon a vocational expert ("VE") to provide testimony on the claimant's ability to transition to other work. However, because the Grid considers only "exertional" (i.e., strength) limitations,

3

rather than non-exertional impairments (e.g., mental impairments), if the claimant suffers from non-exertional limitation(s) that substantially reduce her range of work, use of the Grid is inappropriate and the ALJ must consult a VE (although she may in some cases use the Grid as a "framework" for making her decision).  See. e.g., Fast v. Barnhart, 397 F.3d 468, 470-72 (7th Cir. 2005).

## II.  FACTS AND BACKGROUND

**A.    Medical Evidence**

**1.    Treating Sources**

The medical records reveal that in the late 1980's and early 1990's plaintiff periodically sought treatment for leg and back pain, which tended to resolve spontaneously with the help of medication and physical therapy.  (Tr. at 121-22; 126-27; 144.)  In August 1994, plaintiff's primary physician, Dr. Joseph Armah, took her off work based on a diagnosis of lumbo-sacral myofascial sprain and referred her for a course of physical therapy (Tr. at 156), which did not appear to help much (Tr. at 148-55).  In September 1994, plaintiff received epidural steroid injections, which provided temporary relief.  (Tr. at 141-42; 144-47.)  After the pain returned the following month, Dr. Vijay Kulkarni recommended that plaintiff wear a lumbo-sacral back support.  (Tr. at 168.)  Dr. James Guhl ordered another course of therapy (Tr. at 180), as well as scans of plaintiff's hips and back, which came back negative.  Dr. Guhl did note "slight uptake" on a bone scan (Tr. at 159), possibly indicative of arthritis (Tr. at 297), and ordered an EMG (Tr. at 157-60; 173), which showed normal nerve conduction but "abnormal needle examination" (Tr. at 278) indicative of chronic bilateral L5, S1 radiculopathy (Tr. at 296).   Dr. Guhl also obtained a CT scan of plaintiff's lumbar spine, which revealed central disc herniation

4

at L5-S1, which impinged on the anterior aspect of the dural sac.  (Tr. at 294.)

In February 2005, Dr. Armah referred plaintiff to Dr. James Lloyd, who obtained a lumbar myelogram, which came back normal (Tr. at 185), and a lumbar CT scan, which showed minimal bulging at L5-S1 but no significant degenerative changes (Tr. at 186).   Dr. Lloyd advised that surgical intervention was not needed but that further physical therapy may be of benefit.  (Tr. at 191.)  On March 25, 1995, Dr. Armah released plaintiff back to work with the recommendation that she wear a lumbo-sacral support.  (Tr. at 195.)  Plaintiff apparently returned to work for one day but was unable to tolerate the pain and quit.  (Tr. at 279; see also Tr. at 299, regarding plaintiff's termination of employment.)

In April 1995, plaintiff began seeing Dr. O'Regan for primary care, and in June of that year Dr. O'Regan completed an RFC questionnaire, listing plaintiff's diagnosis as back and hip pain, with "possible permanent disability."  (Tr. at 232.)  Dr. O'Regan opined that plaintiff often experienced pain sufficient to interfere with attention and concentration, and suffered a "marked limitation" in her ability to deal with normal work stress.  (Tr. at 233.)  Regarding plaintiff's functional abilities, Dr. O'Regan opined that plaintiff could stand/walk less than two hours in an eight hour day, sit about four hours in an eight hour day, and required "frequent periods of walking during an eight hour work day to relieve pain," as well as a job that permitted her to shift positions at will from seated to standing or walking.  (Tr. at 234.)  Dr. O'Regan further opined that plaintiff could not lift or carry any amount of weight and had no ability to bend or twist at the waist.  (Tr. at 235.)

On June 5, 1995, plaintiff saw Dr. Alberta Spreitzer, a physiatrist, who recommended that plaintiff see the psychology department for pain and stress management.  (Tr. at 311-12.) On July 21, plaintiff saw Darrell Hischke, Ph. D., and Laura McDaniels, M.S., a psychology

5

intern, who diagnosed psychological factors affecting physical condition (pain and headaches), rule out depressive disorder, and history of substance abuse. (Tr. at 307-09.) They recommended supportive and skills training therapy with biofeedback-assisted relaxation training twice per week. (Tr. at 310.) A discharge note dated September 1, 1995, indicated that the goals of therapy – reduced pain and more effective coping – were met. (Tr. at 306.)

On September 26, 1995, plaintiff saw Dr. Elizabeth Polachek, another physiatrist, complaining of low back pain, left shoulder pain and left hemibody pain. Dr. Polachek suspected degenerative joint disease, especially at the right hip and lumbar spine, with "symptom magnification present." (Tr. at 280.) Dr. Polachek ordered further testing and provided Tylenol for pain and Ambien for sleep. (Tr. at 280.) A repeat EMG performed on October 3 revealed no remarkable abnormalities (Tr. at 277), and x-rays of the right hip were likewise within normal limits (Tr. at 276). With no evidence of lumbo-sacral or cervical radiculopathy, Dr. Polachek attributed plaintiff's symptoms to myofascial pain and degenerative joint disease, continued plaintiff's medications and started her on a physical therapy program. (Tr. at 276.) After one month of therapy, plaintiff returned to Dr. Polachek on November 21, stating that the therapy was not helping but rather may be making things worse. (Tr. at 270.) Dr. Polachek provided a prescription for Zoloft for depression and encouraged plaintiff to continue on physical therapy. (Tr. at 270.)[2] Plaintiff returned to Dr. Polachek on January 26 and April 10, 1996, reporting that things were about the same. Dr. Polachek continued plaintiff's prescriptions for Ambien and Zoloft, encouraged her to continue with her home

---

[2]Dr. Polachek obtained a consult from Dr. Mary Ellen Csuka, a rheumatologist, who suspected a somatoform disorder. (Tr. at 270; 303.) An MRI done on December 22, 1995, revealed degenerative disc disease at L5-S1 with mild diffuse bulging. (Tr. at 266.)

6

exercise program, and referred her to the mental health clinic for continuing psychiatric follow-up.  (Tr. at 303.)

On September 12, 1996, Dr. Armah completed a physical capacities evaluation, opining that plaintiff could sit, stand and walk one hour at a time; sit a total of two hours in an eight hour day and stand or walk one hour in an eight hour day; and occasionally lift and carry up to twenty pounds but never more.  He further stated that she could not use either hand or foot for repetitive activities, and could not bend, squat, crawl, climb or reach.  Finally, he stated that she could not work around unprotected heights or drive automotive equipment.  (Tr. at 313.)

On September 27, 1996, plaintiff returned to Dr. Hischke, the psychologist, reporting that although she felt good after her last discharge in September 1995, she currently felt significant pain and depression.  She reported memory problems, weight gain and fatigue.  Dr. Hischke diagnosed major depression, recurrent, and chronic pain, and scheduled individual psycho-therapy.  (Tr. at 315, 317.)  Plaintiff attended one session then missed the next three, two without calling, and was therefore discharged due to lack of attendance.  (Tr. at 316.)

On January 14, 1997, plaintiff sought further psychiatric treatment at the Medical College of Wisconsin, and Dr. Geiger assessed major depression secondary to chronic pain, with a GAF of 55.[3]  (Tr. at 662-64; 1178-79.)  Plaintiff cancelled her appointment on January 28, and on February 11 reported feeling good after a nerve block at the pain clinic.  She cancelled her appointments on February 12 and 26 (Tr. at 660; 1176), and after she missed another

_____

[3]GAF stands for Global Assessment of Functioning.  Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others.  Scores of 61-70 reflect "mild" symptoms, 51-60 "moderate" symptoms, 41-50 "severe" symptoms and 31-40 a "major impairment."  Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

appointment on March 12, the counselor, Joan Hugl, expressed doubt that plaintiff was interested in individual therapy (Tr. at 659; 1175). Plaintiff made her appointment on March 14 but not March 25. (Tr. at 657-58.) On April 1, Dr. Geiger noted an apparent deficit in registration of information, absent mindedness, mild memory deficit and reduced concentration, which he believed could be related to her medications. He also assessed major depression, which had not been adequately addressed with medication. (Tr. at 656.) On April 15, plaintiff felt somewhat less depressed, but with continued pain and trouble sleeping. (Tr. at 654.) On May 13, plaintiff reported clearer thinking when not taking her muscle relaxer, and that therapy was helping. (Tr. at 653; 1185.) Plaintiff saw the counselor on May 20, cancelled on June 3 and 6, returned on June 10, then failed to show on June 26. (Tr. at 648-52; 1174.)

On July 18, 1997, psychiatrist Harold Harsch diagnosed major depression and placed plaintiff on an anti-depressant, Serzone. (Tr. at 647; 1231.) On September 19, plaintiff reported that her mood swings had improved since July. Mental status-wise, she appeared euthymic without psychotic symptoms, and had stopped seeing her counselor. Dr. Harsch continued her on Elavil. (Tr. at 645; 1237.) On December 19, plaintiff told Dr. Harsch that she felt better globally. Dr. Harsch wrote that he did not currently see her as having major depression but low grade depression and frustration secondary to chronic pain. (Tr. at 644; 1236.)

On March 20, 1998, plaintiff reported an exacerbation of her back pain and requested resumption of individual therapy. Dr. Harsch diagnosed chronic pain with depression, referred her for individual therapy and continued Elavil. (Tr. at 643; 1235.) On March 27, plaintiff saw counselor Hugl, who assessed major depression secondary to her medical condition, with a GAF of 55. (Tr. at 641.) Plaintiff returned to Dr. Harsch on April 10, very distressed, and Dr.

8

Harsch discontinued Elavil and started her on Paxil. (Tr. at 637; 1234.) Plaintiff told Hugl she was feeling somewhat better on the new medication on April 29. (Tr. at 635; 1294.)[4] On May 15, Dr. Harsch found plaintiff's depression improved both subjectively and objectively on Paxil, although she continued to report significant pain in her back and shoulders. (Tr. at 633; 1233.) Plaintiff cancelled her appointments with Hugl on May 15 and 28, and June 1. (Tr. at 630-32; 1293.) On June 4, plaintiff told Hugl she was less depressed on her current medications (Tr. at 629; 1292), and on June 18 said she was feeling somewhat better (Tr. at 627). On June 26, Dr. Harsch also reported improved mood with Paxil. (Tr. at 626; 1232.) Plaintiff was a no-call, no-show for counseling on July 1 and 16. (Tr. at 625; 628; 1290-91.) She reported temper problems on July 28, but Hugl's assessment again was that she was "somewhat improved." (Tr. at 624; 1289.)

On July 31, 1998, plaintiff's new psychiatrist, Dr. Risinger, increased plaintiff's Paxil dosage. (Tr. at 1288.) Plaintiff cancelled her counseling session for August 25 (Tr. at 1287), returned on August 31 and seemed to be improving. (Tr. at 620; 1286.) She was a no-call, no-show on September 17 (Tr. at 1285), and reported continued improvement with medication on October 16 (Tr. at 617-18; 1283-84). She was again a no-show on November 11, and when contacted stated that she was "'doing alright' and had forgotten about the appointment." (Tr. at 616; 1282.) She was once again a no-call, no-show on December 4. (Tr. at 615; 1281.) On December 18, she reported frequent arguments with her boyfriend (Tr. at 614; 1280), and

_____

[4]An MRI completed on May 7, 1998, revealed disc degenerative changes at L5-S1, with mild bulging but no evidence of focal herniation or thecal sac deformity. (Tr. at 607.)

9

on January 3, 1999, a stable mood despite some stressors.  (Tr. at 1279.)[5]

On January 14 and 25, 1999, plaintiff reported worsening depression, which she attributed to increased pain (Tr. at 612-13; 1182; 1278), but on February 11 said she did better when she paced herself.  Plaintiff and the counselor also discussed how plaintiff used her pain as a means of getting sympathy and attention from her boyfriend, which was absent when she was pain-free.  (Tr. at 715; 1277.)  On February 12, Dr. Risinger noted plaintiff to be stable, with a brighter affect.  (Tr. at 714; 1276.)  On April 2, plaintiff reported increased frustration with her relationship (Tr. at 713; 1275), and on April 16, Dr. Risinger noted that plaintiff's depression had worsened (Tr. at 712; 1274).  On April 29, plaintiff reported continued memory problems, lack of motivation, and sleep and appetite difficulty.  (Tr. at 711; 1273.)

On May 6, 1999, Dr. Risinger prepared a report in which he generally rated plaintiff's mental abilities to do unskilled work as fair to good, but poor regarding her ability to complete a normal workday without interruption from psychological symptoms.[6]  He further indicated that chronic pain limited her ability to stand and depression affected her ability to concentrate and focus.  (Tr. at 682.)  He rated her ability to interact with others, adhere to basic standards of neatness and travel in unfamiliar places as good, but stated that she would be absent more than three times per month based on her conditions.  (Tr. at 683.)

On May 13, 1999, plaintiff and the counselor discussed how memories of past abuse

---

[5]In 1998, plaintiff applied for services through the state Division of Vocational Rehabilitation ("DVR").  After an evaluation at Goodwill, at which plaintiff reported inability to perform even a very limited sedentary assignment due to pain, the DVR concluded that rehab services would not result in plaintiff's securing and maintaining work.  (Tr. at 552-69.)

[6]It is not clear whether this report was prepared by Dr. Harsch or Dr. Risinger.  (Compare Tr. at 1029, 1454, Harsch, with Tr. at 893, 916, 938, Risinger.)  The signature is eligible.  In any event, because both doctors were treating sources, the analysis would be the same.

10

contributed to her current problems.  (Tr. at 710; 1272.)  Dr. Risinger continued plaintiff on Paxil in May 1999 (Tr. at 708-09; 1271), and she reported that her medications were working out well during her June session (Tr. at 706; 1268).  On July 8, plaintiff told the counselor that her physical pain and depressive symptoms remained unchanged, and that she continued to experience forgetfulness and concentration difficulties.  (Tr. at 705; 1266.)  She cancelled her July 22 and 29 and August 13 sessions (Tr. at 1262-64), then reported doing better on September 10 (Tr. at 702; 1260), and Dr. Risinger started her on Wellbutrin (Tr. at 700, 703).  Plaintiff reported a fairly stable mood on October 15, but with some sadness, angry outbursts and insomnia, which she attributed to the impending death of her mother.  (Tr. at 699; 1257.)  On November 5, plaintiff noted anxious feelings and increased pain over the past two weeks. (Tr. at 1256.)

On November 12, 1999, Dr. Risinger prepared another report in which he indicated that plaintiff's abilities in most of the areas needed to perform unskilled work were fair, but poor in the areas of pace and work stress.  He wrote that her frequent exacerbation of back pain rendered her unable to focus or attend to a job.  (Tr. at 722.)  He further wrote that she had poor or no ability to maintain socially appropriate behavior and would be absent more than three times per month based on her impairments.  (Tr. at 723.)[7]

On December 3, plaintiff reported a low mood since her social security claim had been denied on November 23.  (Tr. at 1254.)  On December 20, she reported improved sleep with her medication.  (Tr. at 1252.)  In a January 20, 2000 note, Dr. Risinger listed the diagnoses

_____

[7]In late 1999, plaintiff also underwent additional physical therapy at Curative Rehabilitation Services, which seemed to provide some relief.  (Tr. at 685-86; 716-21.) Additional scans taken on October 20, 1999, revealed L5-S1 degenerative disc disease but a normal left hip.  (Tr. at 688; 698; 1005-06; 1224-25.)

11

as PTSD and depression, NOS. (Tr. at 1251.) On January 21, plaintiff told her counselor that she experienced improvement in her pain after a nerve block. She reported better memory, self-control and mood on pain-free days. (Tr. at 1250.) On March 8, plaintiff reported an exacerbation of depression and daily pain in her hip and back. (Tr. at 1248.) On March 22, plaintiff's counselor discussed her need for sleep and pain medication to aid her agitated nerves. (Tr. at 1247.) On March 23, they again discussed plaintiff's anger following the denial of her social security application. (Tr. at 1246.)[8]

On March 30, 2000, Dr. Risinger found plaintiff tearful and distraught, and on April 12 she reported to the counselor an exacerbation of pain and depression, but a small improvement of sleep with medication. (Tr. at 1244-45.) On May 24, plaintiff's counselor and Dr. Risinger listed a diagnosis of major depression due to medical condition, with a GAF of 55. (Tr. at 1348.) On May 10, plaintiff reported to her counselor increased calmness and decreased irritability with new medications from the pain clinic (Tr. at 1346), but on May 24 she noted pain, irritability and moderate depression since her last session (Tr. at 1345). On June 14, she reported no change in her psychological state despite several flare-ups of pain. (Tr. at 1344.) She was a no-call, no-show on July 7. (Tr. at 1343.) On July 20, she noted increased difficulty sleeping, continued irritability and three to four bouts of severe despair related to episodes of pain. (Tr. at 1342.) On August 11, plaintiff reported depressed mood,

---

[8]As indicated earlier, plaintiff received SSI pursuant to a later application effective March 2000. Plaintiff also continued to receive treatment for pain at the Froedert Pain Management Center, which included medication, a TENS unit and SI joint injections. (Tr. at 665-81; 1319-22.) Plaintiff continued to receive pain medication and nerve blocks at Froedert from 2000 to 2002. (Tr. at 964-94.) An MRI performed on April 17, 2000 revealed degenerative changes with a disc herniation at L5-S1, and disc bulging to a lesser degree at L4-L5. (Tr. at 1002; 1221.)

12

increased irritability, concentration problems and insomnia in the past two weeks, which she attributed to problems dealing with her significant other. (Tr. at 1341.) On September 15, plaintiff again reported increased depressive symptoms in the past two weeks, after experiencing a slight improvement in mood about three weeks ago. The counselor identified several reasons, including a change in a medication, the waning effects of a nerve block and psycho-social stressors. (Tr. at 1340.)

On September 29, 2000, plaintiff reported continuing pain, insomnia, low mood and concentration problems during the past weeks. (Tr. at 1339.) On October 19, Dr. Risinger noted mild worsening of depressive symptoms in the context of disappointment of another social security rejection. (Tr. at 1335.) On October 23, plaintiff reported a continuation of depressive symptoms. (Tr. at 1390.) She was a no-call, no-show on December 1. (Tr. at 1389.) On December 13, she reported continued difficulties with pain, which affected her sleep, mood and motivation. (Tr. at 1388.) On February 20, 2001, plaintiff saw a new counselor, tearful and in obvious physical discomfort. (Tr. at 1384.) On March 13, plaintiff reported continuing to have a lot of pain, which seemed to be the focus of her life. (Tr. at 1383.)

### 2. SSA Consultants

The SSA arranged for plaintiff's physical and mental condition to be evaluated by consultants at various stages of these proceedings. On March 1, 1995, plaintiff underwent a mental status evaluation with SSA consultant Joan Nuttal, Ph.D. During their interview, plaintiff reported feelings of depression and mood swings. She also relayed experiences finding herself somewhere and not knowing how she got there, and of finding new clothes in her closet with no recollection of how they got there. (Tr. at 187-88.) Dr. Nuttal found the "diagnostic

13

dilemma with [plaintiff] extremely complicated" and one "not possible to elucidate clearly from this one contact." (Tr. at 189.) Her impressions were rule out dissociative identity disorder, rule out bipolar disorder and rule out major depression, with a GAF of 65. (Tr. at 190.)

On March 16, 1995, SSA consultant Dean Smith, M.D., completed a physical RFC assessment in which he opined that plaintiff could perform medium work (i.e., lifting up to fifty pounds occasionally, twenty-five pounds frequently), with no other limitations.[9] (Tr. at 97-104.) Also on March 16, 1995, Anthony Matkom, Ph. D., completed a psychiatric review technique form for the SSA, finding that plaintiff suffered from an affective disorder, which did not meet the Listings. (Tr. at 105-13.) In an accompanying mental RFC assessment, Dr. Matkom opined that plaintiff experienced no significant or just moderate limitations based on her mental condition. (Tr. at 114-14.)[10]

On July 6, 1999, Dr. Thomas Grundle, a licensed psychologist, interviewed plaintiff and her daughter, then completed a medical assessment of plaintiff's ability to work in which he found her ability to make occupational adjustments (e.g., follow work rules, relate to others, use judgment, maintain concentration) to be fair to good; her ability to make performance adjustments (e.g., understand instructions) to be fair for complex matters, good for detailed matters, and very good for simple matters; and her ability to make personal-social adjustments (e.g., maintain appearance, relate predictably, demonstrate reliability) to be fair to good. (Tr. at 524-25.)

On July 16, 1999, Dr. Dewey Jones examined plaintiff and completed a written medical

---

[9]Dr. Robert Callear reviewed and affirmed Dr. Smith's assessment on May 5, 1995.

[10]Jean Warrior, Ph. D., reviewed and affirmed Dr. Matkom's conclusions on May 12, 1995. (Tr. at 106; 116.)

assessment of ability to do work-related activities, opining that plaintiff could lift/carry one pound frequently, up to five pounds occasionally; stand/walk a total of two to four hours in an eight hour day, one hour without interruption; sit two to three hours in an eight hour day, ½ to one hour continuously; and occasionally climb but never perform other postural activities such as balancing, stooping, crouching or crawling. (Tr. at 532-33.) He found no limitations in reaching, handling, pushing/pulling, seeing, hearing and speaking, but due to her balance problems recommended against working around heights or moving machinery. (Tr. at 533.)

On September 2, 1999, Dr. Ward Jankus examined plaintiff and completed a work assessment form, in which he opined that plaintiff could lift ten to fifteen pounds occasionally, five to ten frequently; stand/walk four hours total in an eight hour day, fifteen to thirty minutes without interruption; sit four to six hours in an eight hour day, fifteen to thirty minutes without interruption; occasionally perform most postural movements, but never climb ladders, kneel or crawl; no prolonged heavy pushing and pulling; and avoidance of heights and heavy equipment. (Tr. at 537-38.) In his narrative report, Dr. Jankus indicated that she would need to change positions frequently. (Tr. at 543.)[11]

---

[11]The record contains other consultant reports from after the relevant time period. For instance, on September 26, 2000, Kenneth Sherry, Ph.D, conducted a psychological evaluation, then diagnosed depressive disorder, NOS, subsequent to alleged chronic pain, with a GAF of 45-50. (Tr. at 1349-52.) Dr. Sherry opined that the primary issue was depression secondary to the reported pain disorder, as plaintiff was quite clear that if not in pain she would not be depressed. He indicated that she had the ability to understand, remember and carry out instructions of minimal complexity, and probably could respond appropriately to others and maintain adequate attention, concentration and pace if pain fee. (Tr. at 1352.) On October 2, 2000, Dr. Robert Callear completed a physical RFC assessment, opining that plaintiff could perform sedentary work. (Tr. at 1354-61.) On October 3, 2000, Anthony Matkom, Ph.D., completed another psychiatric review technique form, indicating that plaintiff suffered from an affective disorder which produced moderate restriction of activities of daily living; mild restriction of social functioning and concentration, persistence and pace; with no episodes of decompensation. (Tr. at 1366-79.) In an accompanying mental RFC form, Dr. Matkom opined

15

**B.      Hearing Testimony**

**1.      September 16, 1996 (First) Hearing**

At her first hearing on September 16, 1996,[12] plaintiff testified that her date of birth was November 14, 1951, she stood five feet tall, and weighed 154 pounds – a significant increase from her typical weight of 115 to 123.  She stated that for the past year she lived with her daughter Cherrie and four year old granddaughter; before that, she lived alone.  (Tr. at 326; 360.)  She indicated that she went as far as the ninth grade in school.  (Tr. at 326.)  She testified that her attempts to obtain a GED were interrupted first by her pregnancy at age seventeen then thwarted by her inability to understand things she had read.  (Tr. at 328.)  She stated that she was able to read but needed help filling out forms.  (Tr. at 329.)

———————————————

that plaintiff was moderately limited in fifteen of twenty areas, not significantly limited in the other fifteen.  (Tr. at 1362-65.)  However, on May 4, 2001, Jean Warrior, Ph.D., completed a psychiatric review technique form, indicating that plaintiff suffered from an affective disorder, with marked limitations of activities of daily living and concentration, persistence and pace.  (Tr. at 1394-1406.)  Thus, according to Dr. Warrior, plaintiff met Listing 12.04.  It appears that this report caused the SSA to grant plaintiff's 2000 application on reconsideration.  (Tr. at 1015.)  In 2002, the SSA obtained additional reports from Dr. Mark Wright (Tr. at 951-53) and Dr. Sherry.  Dr. Sherry noted that plaintiff associated her depression with her physical problems, stating that if she were not in pain she would not be depressed.  (Tr. at 954-56.)  She also stated that she was not at that point making any claim for mental illness.  Dr. Sherry diagnosed pain disorder and mild depressive disorder, with a GAF of 50-60.  He opined that she could understand, remember and carry out instructions of minimal complexity, and could respond appropriately to supervisors and co-workers.  (Tr. at 957.)  He found her attention, concentration and pace somewhat marginal but adequate for basic tasks.  He indicated that no psychological condition would limit her ability to stand the stress of routine work, although physical issues could override this.  (Tr. at 958.)  In an accompanying report, he rated her ability to make occupational adjustments as generally fair to good; her ability to carry out detailed or complex instructions as poor, but her ability to carry out simple instructions as good; and her ability to make personal-social adjustments as unlimited/very good.  (Tr. at 959-60.)

[12]Plaintiff appeared pro se on July 16, 1996, and the ALJ granted her an adjournment to allow her time to find counsel.  (Tr. at 319-22.)  Plaintiff has been represented by her current counsel since the September 1996 adjourned hearing.

16

Plaintiff testified that she last worked at General Plastics, where she ran a machine requiring her to frequently lift five to ten pounds, sometimes up to thirty pounds. (Tr. at 330.) She stated that she previously worked at Sussex Plastics doing similar work (Tr. at 330) and at various other jobs before that (Tr. at 332). She indicated that she left the job at General Plastics due to pain. (Tr. at 331.)

Plaintiff stated that she could not work due to pain in her back, both hips and down her legs and left arm, and because her "thoughts aren't right anymore." (Tr. at 331; 333.) She stated that she had difficulty sleeping due to pain, which was only partially aided by sleeping pills, and pain and cramping in her hands. (Tr. at 334.) She testified that she rarely drove because she got lost. (Tr. at 335.) She stated that her daughter no longer wanted her to watch her granddaughter because of her mood swings and an incident in which she struck her granddaughter. (Tr. at 336-37.) She said that her irritability started every day at two o'clock. Sometimes, she exploded, shouting and cursing. (Tr. at 338.)

Plaintiff testified that she had good days and bad days; during the latter, she did absolutely nothing and wanted to be alone; during the former, she exercised, took walks and played with her granddaughter. (Tr. at 339-40.) She said that on some days she did not remember what had happened or what others had told her, and at times she felt like hurting others. (Tr. at 340-43.) She stated that she could not sit for more than fifteen or twenty minutes because her back, hip and neck hurt, could not stand for more than fifteen or twenty minutes, or walk more than two to four blocks. (Tr. at 347-48.) She also stated that she suffered chronic headaches (Tr. at 348) and had problems with her neck and hands, including numbness (Tr. at 349).

Plaintiff said that she was able to cook on some days, do a little bit of cleaning, and help

17

some with the laundry. (Tr. at 353-54.) She engaged in no social activities. (Tr. at 356.) She described her pain as 20 on a 1-10 scale. (Tr. at 357.) On redirection from her lawyer, she rated her pain as 5 to 7 on an average day, 10 on a bad day. (Tr. at 357-58.)

Plaintiff's daughter Cherrie testified that plaintiff was forgetful, irritable and talked to herself, and that after an incident in which plaintiff hit her daughter, she did not trust plaintiff with the child anymore. (Tr. at 363-64.) She stated that her mother had not always been this way – irritable and forgetful – only for the past two years. (Tr. at 367-68.)

### 2. November 23, 1999 (Second) Hearing[13]

At the second hearing, plaintiff again testified that she was precluded from working due to pain in her back, hip, legs, arms and hand. (Tr. at 799.) She indicated that she had been using a cane, prescribed by Curative, for about four months. (Tr. at 800.) She further testified to severe headaches, at times every day. (Tr. at 800-01.) She indicated that she took medication for pain, which caused side effects of drowsiness and light-headedness. (Tr. at 803.) She stated that she also used a TENS unit, which did not really help. (Tr. at 804.) She testified that on bad days, her pain rated 10 on a 0-10 scale, and that aside from using the bathroom she stayed in bed. (Tr. at 806.) On a good day, her pain rated 5 out of 10, and she might try to help around the house, washing dishes and straightening up. She said that when she tried to cook she burned things. (Tr. at 807.) She stated that she lived with her daughter and her two grandchildren, then aged seven years and three months, and that they bothered her and she ended up "going off on the kids." (Tr. at 808.) She stated that she had bad days three or four days per week. (Tr. at 808-09.) She testified that her psychiatrist had her on

---

[13]In summarizing the testimony at subsequent hearings I have omitted that which is largely redundant of the previous hearings.

Case 2:07-cv-00940-LA   Filed 01/20/09   Page 18 of 34   Document 29

Welbutrin and Ambien. (Tr. at 810.) She denied ever going out to movies or restaurants. (Tr. at 813.) Other than spending time with her boyfriend and sister, she stated that she mostly kept to herself. (Tr. at 813-15.) She testified that she often "went off" on her boyfriend and daughter, shouting, cursing and throwing things. (Tr. at 816.) Her only income was food stamps. (Tr. at 822.) Plaintiff's daughter Cherrie testified that plaintiff was worse, mentally, since the last hearing, more depressed and less active. (Tr. at 828-31.)[14]

### 3. December 5, 2002 (Third) Hearing

At the third hearing, plaintiff testified that she last worked on August 23, 1994, after which she had to stop due primarily to right leg and hip pain. (Tr. at 454.) She stated that she tried to return to work in March 1995 but lasted just one day due to pain. (Tr. at 455.) She testified that thereafter Dr. O'Regan kept her off work. (Tr. at 458.) She further testified that some of her medications caused side effects, such as nausea, hallucinations and sleepiness. (Tr. at 460-61.) She stated that she started using a cane in 1999. (Tr. at 464.)

The VE, Beth Hoynik, testified that plaintiff's past work was light, unskilled work, which allowed for a sit/stand option. (Tr. at 477-78.) The ALJ then asked a series of hypothetical questions, all assuming a person forty-eight years old with a limited education and work history like plaintiff's. (Tr. at 478.) The first question assumed a person capable of medium work, of a routine, repetitive, unskilled nature. The VE opined that such a person could perform plaintiff's past work. (Tr. at 479.) If the person could only occasionally perform postural activities, was limited to light work or needed a sit/stand option, the answer was the same. (Tr. at 479.) If the person were limited to sedentary work, she could not perform plaintiff's past

---

[14]ALJ Bartelt summoned a VE, Robert Verkens, to testify at this hearing. (Tr. at 832-42.) ALJ O'Grady did not rely on this VE testimony in the decision now under review.

19

work as she performed it, but could perform sedentary assembly (900 jobs in the greater Milwaukee area) and sedentary hand packaging (400 jobs) work. (Tr. at 480.)

### 4. October 14, 2005 (Fourth) Hearing

At the fourth hearing, plaintiff confirmed that her previous testimony was truthful. (Tr. at 1436.) Plaintiff's daughter Cherrie testified that plaintiff's condition was worse in 1994-1995 than in March 2000 after she was awarded SSI. (Tr. at 1440-41.) Cherrie also said that plaintiff refused to seek mental health treatment until 1999.[15] (Tr. at 1441.) She further testified that during this time period, 1994 to 1996, plaintiff did not clean up after herself and got lost when she tried to drive somewhere. (Tr. at 1442.) At times, plaintiff would buy things and not remember doing it. (Tr. at 1443.) She had to be reminded to bathe, and her medications made her sleepy, moody and irritable. (Tr. at 1443.)

At this hearing, VE Hoynik classified plaintiff's past work as light to medium, unskilled work. (Tr. at 1448.) The ALJ then asked a series of hypothetical questions. The first assumed a person capable of medium, unskilled, simple, routine, repetitive jobs. The VE stated that this person could perform plaintiff's past work. (Tr. at 1448.) Adding the limitation of occasional postural movements, the answer was the same. (Tr. at 1448.) If the person were limited to light work, the work could still be done. (Tr. at 1448.) If the person could have no public contact and limited interaction with co-workers, the past work could still be done. (Tr. at 1448-49.) If the person was limited to sedentary work, the person could not perform the past work but could work as an assembler. The VE testified to 400 production/assembly jobs in

---

[15]The medical records indicate that plaintiff started on medications for mental problems as early as 1995, and received psychiatric treatment in 1996 and 1997 with Drs. Geiger, Harsch and Hischke.

Case 2:07-cv-00940-LA   Filed 01/20/09   Page 20 of 34   Document 29

Wisconsin at the sedentary level. She also identified 20 machine operator jobs. (Tr. at 1449.)[16]

## C. The ALJ's January 2006 Decision

In her January 2006 decision, ALJ O'Grady followed the required five-step process, denying the claim at step five. ALJ O'Grady found that plaintiff had not worked subsequent to her alleged onset date and that she suffered from severe impairments – degenerative disc disease with related chronic back pain, depression and a somatoform disorder – none of which met or equaled a Listing during the relevant period. The ALJ then concluded that plaintiff retained the RFC for unskilled, sedentary work which allowed for a sit/stand option. Based on this RFC, the ALJ concluded that plaintiff could not perform her past work but, relying on the testimony of the VE and using Grid Rule 201.18 as a framework, found that plaintiff could perform other jobs such production worker, packager and machine operator. (Tr. at 1049-50.)

In reaching these conclusions, the ALJ rejected plaintiff's contentions of disabling pain, noting the lack of objective medical support and the conservative treatment plaintiff received for her back pain. (Tr. at 1045; 1047.) The ALJ noted the reports from Drs. Armah, O'Regan and Jones, which imposed severe physical restrictions, but instead credited the report of examining consultant Dr. Jankus. (Tr. at 1045-46.) Regarding plaintiff's mental status, the ALJ acknowledged Dr. Risinger's opinion that plaintiff would have difficulty remembering even simple instructions and had poor or no ability to complete a normal workday without

---

[16]At both hearings before ALJ O'Grady, VE Hoynik testified that no work would be available assuming the restrictions in the reports from Drs. O'Regan (Tr. at 483-85; 1450-51), Armah (Tr. at 486-87), Jones (Tr. at 488-89) and Risinger (Tr. at 492-93; 494-95; 1454; 1455). However, the person could perform the identified jobs under the restrictions listed by Drs. Grundle (Tr. at 487-88) and Jankus (Tr. at 490-91).

21

interruptions from psychologically based symptoms. However, the ALJ noted that plaintiff's attention and concentration skills appeared to be intact during the exam by Dr. Nuttall and instead credited the report of examining consultant Dr. Grundle, who opined that plaintiff had a very good ability to understand, remember and carry out simple instructions. (Tr. at 1046.) The ALJ further noted Dr. Harsch's opinion that plaintiff did not suffer from major depression, and that her mental problems were largely reactive to her physical problems. (Tr. at 1047.)

## III. DISCUSSION

Plaintiff alleges that the ALJ erred in evaluating (1) the medical opinions, (2) the credibility of the testimony and (3) RFC.[17] She further argues that the Commissioner failed to meet his burden at step five. As a remedy, she requests a judicial award of benefits. I address each argument in turn.

## A. Evaluation of Medical Reports

### 1. Legal Standard

Under 20 C.F.R. § 404.1527(d), the ALJ is required to evaluate all of the medical opinions of record. However, the manner of evaluation varies based on the source of the opinion. Under the so-called "treating source rule," opinions from the claimant's treating physicians are entitled to "controlling weight" if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent" with other substantial evidence. 20 C.F.R. § 404.1527(d)(2). If the record contains substantial

---

[17]Plaintiff couches these three arguments in terms of the ALJ's failure to follow the Appeals Council's latest remand order. However, the ALJ considered these issues; plaintiff simply disagrees with the ALJ's conclusions. Further, the Council declined to review the ALJ's decision, so I will thus review the ALJ's decision as the final decision of the SSA in this case. See Perkins v. Chater, 107 F.3d 1290, 1294 (7th Cir. 1997).

22

contradictory evidence, such as the contrary report of an SSA consultant, the presumption in favor of the treating source report generally drops out of the case, and the ALJ must determine how much weight to give all of the reports by considering a variety of factors. See Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008); see also Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008). The relevant factors include: whether the source examined the claimant; whether the source treated the claimant and, if so, the length, frequency, and nature and extent of the treatment relationship; how well the source explained and supported the opinion with medical signs and laboratory findings; the consistency of the opinion with the record as a whole; whether the source is a specialist; and other factors, such as the source's understanding of SSA disability programs and their evidentiary requirements. 20 C.F.R. 404.1527(d); see also SSR 96-2p. If, after considering the relevant factors, the ALJ adopts one opinion over another the court generally must allow that decision to stand so long as the ALJ minimally articulated her reasons. See Berger, 516 F.3d at 545.

**2.    Analysis**

**a.    Opinions on Plaintiff's Physical Limitations**

Plaintiff first challenges the ALJ's decision to adopt examining consultant Dr. Jankus's report over that offered by treating sources Drs. O'Regan and Armah and examining consultant Dr. Jones. Plaintiff notes that three reports support her claim, while just one rejects it. But the ALJ is not required to credit the larger number of reports. See Woodward v. Dir., OWCP, 991 F.2d 314, 321 (6th Cir. 1993) (stating that an ALJ should consider quality, not quantity, in evaluating conflicting medical evidence). Instead, the ALJ did what she was supposed to do – consider the conflicting evidence and provide reasons for adopting one report over the

23

others.  See Young v. Barnhart, 362 F.3d 995 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts . . .  is exactly what the ALJ is required to do.").

First, the ALJ declined to adopt the September 1996 report from Dr. Armah, noting that the severe restrictions it contained were inconsistent with his releasing plaintiff to return to work in March 1995 subject only to wearing a back support.  Plaintiff complains that the ALJ failed to explain the inconsistency between the two reports, but the difference – return to work with virtually no restriction versus total disability – is so pronounced the ALJ was not required to spell it out.  Plaintiff also complains that the ALJ failed to account for the fact that her condition could have deteriorated during the time between the two reports, but she cites no evidence supporting this position.  Further, as plaintiff herself notes, Dr. Armah was her primary treating physician from July 1990 to March 1995, and thus was not in a position to document significant changes in her condition between March 1995 and September 1996.  Plaintiff notes that Dr. Armah referred her to various specialists, but she cites no records from any of these providers supporting her position.[18]

Second, the ALJ declined to adopt the restrictions in Dr. O'Regan's June 1995 report, noting that Dr. O'Regan had treated plaintiff for barely two months at the time she completed the report.  Plaintiff states that Dr. O'Regan would have had available the records from the previous providers, but she cites nothing in Dr. O'Regan's report drawing this connection, nor

---

[18]In any event, the records from these specialists do not appear to support plaintiff's claim.  Dr. Kulkarni recommended that plaintiff wear a back support, which recommendation Dr. Armah adopted.  Dr. Guhl ordered various scans, most of which were normal.  An EMG obtained by Dr. Guhl in early 1995 revealed radiculopathy, but as the ALJ noted, a later 1995 EMG revealed no radiculopathy.  Dr. Lloyd opined that plaintiff was not a surgical candidate.  The physiatrists plaintiff saw in 1995 and 1996, Drs. Spreitzer and Polacheck, likewise offered little objective support for the claim.

24

does she cite anything in the records supporting Dr. O'Regan's restrictions. Plaintiff refers to Dr. Polachek, but it appears that Dr. Polachek first saw plaintiff in September 1995, after O'Regan completed her report.[19]  In any event, Dr. Polachek suspected "symptom magnification" and a possible somatoform disorder.  Dr. O'Regan cited no objective medical evidence in her report supporting severe restrictions, and plaintiff cites none in her brief now. See Rice v. Barnhart, 384 F.3d 363, 371 (7th Cir. 2004) ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints.").

Third, the ALJ concluded that Dr. Jankus conducted a more thorough examination and provided a better reasoned and supported report than Dr. Jones.  As the ALJ noted (Tr. at 1047), although Dr. Jones limited plaintiff's total sitting during the course of an eight hour day such that she could not perform full-time work, on examination he noted no significant difficulty sitting.  The ALJ could reasonably conclude that Dr. Jankus's estimate of plaintiff's sitting ability was more accurate.  As the ALJ also noted (Tr. at 1046), Dr. Jankus noted no muscle spasm as Dr. Jones did.  Plaintiff complains that the ALJ did not specifically mention all of the findings discussed in Dr. Jones's report, but that is not required.  See Diaz v. Chater, 55 F.3d 300, 309 (7th Cir. 1995) (stating that the ALJ is not required to discuss every piece of evidence, and the weight to be given to the evidence falls within the discretion of the ALJ).

Finally, the ALJ accepted that plaintiff suffered significant restrictions and pain based on her back problems.  Accordingly, she limited plaintiff to sedentary work with a sit/stand option as needed to control pain.  Plaintiff fails to show that this determination lacks substantial

---

[19]In her brief, plaintiff refers to Dr. O'Regan's June 1996 report, but the report is actually dated June 1995.  (Tr. at 235.)

evidentiary support in the record, that the ALJ skipped substantial evidence contrary to her conclusion, that the ALJ failed to build a bridge from the evidence to the result, or that the ALJ failed to consider the appropriate factors in weighing the medical opinions. Accordingly, the decision must stand. Dixon v. Massanari, 270 F.3d 1171, 1178 (7th Cir. 2001) ("When treating and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence supports that decision.").

### b. Opinions on Plaintiff's Mental Limitations

Plaintiff next contests the ALJ's decision to adopt the opinion of examining consultants Drs. Grundle and Nuttal over that of her treating psychiatrist, Dr. Risinger. The consultants opined that while plaintiff experienced some limitations based on her mental impairments, she nevertheless retained the ability to understand, remember and carry out simple job instructions. Dr. Risinger, on the other hand, opined that plaintiff could not perform at a consistent pace or deal with the routine work stress required of even an unskilled job. The ALJ noted that plaintiff's attention and concentration skills appeared to be intact during the consultants' exams, and that, contrary to Dr. Risinger's view, the medical records – including those from plaintiff's previous treating psychiatrist Dr. Harsch – supported the notion that plaintiff's symptoms were largely reactive to her chronic pain rather than the product of serious mental illness such as major depression. Finally, the ALJ noted that plaintiff's attention and memory problems did not appear to be severe during her therapy sessions and, in any event, diminished with medication adjustments. (Tr. at 1046-47.)

Plaintiff notes that Dr. Grundle, like Dr. Risinger, diagnosed major depression, and thus questions the significance of Dr. Harsch's opinion that plaintiff did not suffer from major depression in rejecting Risinger's report. However, the ALJ's broader point, one supported by

26

both the treatment records (E.g., Tr. at 612-13; 641; 643; 644; 1348) and Dr. Grundle's report (Tr. at 525), was that plaintiff's symptoms were primarily triggered by her pain. Plaintiff also faults the ALJ for not discussing the records from Dr. Hischke, who also diagnosed major depression, but she cites nothing specific in these records bolstering her claim. Thus, the omission was at most harmless error. See Keys v. Barnhart, 347 F.3d 990, 994 (7th Cir. 2003) (applying the harmless error doctrine in social security cases). Finally, plaintiff quotes Dr. Grundle's statement "question[ing] what type of work" plaintiff could "do safely and reliably." (Tr. at 526.) However, Dr. Grundle made this statement after observing that plaintiff appeared to be in physical pain; it did not refer to her mental condition.

Ultimately, as with her physical condition, the ALJ accepted that plaintiff suffered from a severe mental impairment and thus limited her to simple, unskilled work. Also as with the physical RFC, plaintiff fails to show that the ALJ's mental RFC lacks substantial evidentiary support in the record, that the ALJ skipped substantial evidence contrary to her conclusion, or that the ALJ failed to build a bridge from the evidence to the result. Accordingly, this decision also must stand. See Books v. Chater, 91 F.3d 972, 979 (7th Cir. 1996) (stating that it is up to the ALJ to decide which doctor to believe subject only to the requirement that the ALJ's decision be supported by substantial evidence).

**B.    Evaluation of Credibility**

**1.    Legal Standard**

Under SSR 96-7p, the ALJ must follow a two-step process in evaluating the claimant's testimony and statements about symptoms such as pain, fatigue or weakness. First, the ALJ must consider whether the claimant suffers from a medically determinable physical or mental

27

impairment that could reasonably be expected to produce the symptoms.  If not, the symptoms cannot be found to affect the claimant's ability to work.  Second, if the ALJ finds that the claimant has an impairment that could produce the symptoms alleged, the ALJ must determine the extent to which they limit the claimant's ability to work.  If the claimant's statements are not fully substantiated by objective medical evidence, the ALJ must make a credibility finding based on an evaluation of the entire case record, considering factors such as the claimant's activities; the duration, frequency and intensity of the symptoms; precipitating and aggravating factors; treatment modalities; and functional limitations and restrictions. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.  The ALJ must provide specific reasons for her credibility determination, grounded in the evidence.  See, e.g., Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003).

Judicial review of the ALJ's credibility finding is highly deferential.  Because the ALJ is in the best position to see and hear the witnesses, and because of her greater immersion in the record as a whole and specialized expertise with the type of case under review, Carradine v. Barnhart, 360 F.3d 751, 753 (7th Cir. 2004), the court will ordinarily reverse only if the claimant demonstrates that the finding is "patently wrong," Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003); see also Berger, 516 F.3d at 546.

**2.      Analysis**

In her January 2006 decision, the ALJ concluded that the objective medical evidence did not support plaintiff's allegations of pain precluding sedentary work with a sit/stand option. Plaintiff argues that this determination runs afoul of the rule that "the ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995).  She further argues that the ALJ failed to consider other factors set forth in SSR 96-7p.  While the ALJ's analysis could have

28

been more thorough, I cannot conclude that reversal is necessary.

First, it is important to note that the ALJ did not entirely reject plaintiff's complaints of pain. In recognition of those symptoms, she limited plaintiff to sedentary work with the ability to change positions to control pain. This RFC is consistent with what plaintiff told Dr. Jankus about her sitting and standing tolerance during the consultative exam. (Tr. at 540.)

Second, nothing in SSR 96-7p or Seventh Circuit case-law forbids the ALJ from considering the lack of objective medical support for the claimant's allegations in conjunction with other factors. See, e.g., Getch v. Astrue, 539 F.3d 473, 483 (7th Cir. 2008) ("[A]lthough an ALJ may not ignore a claimant's subjective reports of pain simply because they are not fully supported by objective medical evidence, discrepancies between objective evidence and self-reports may suggest symptom exaggeration."); Arnold v. Barnhart, 473 F.3d 816, 823 (7th Cir. 2007) ("The ALJ properly relied on objective medical and other evidence that sufficiently contradicted the credibility of Arnold's claims of disability."); Schmidt v. Barnhart, 395 F.3d 737, 747 (7th Cir. 2005) (affirming credibility determination based on the objective medical evidence and others factors). As the ALJ noted, plaintiff was never considered a surgical candidate, instead receiving conservative treatment; repeat EMG testing revealed no radiculopathy; and the MRI and CT scans taken during the relevant time period generally revealed modest degenerative changes of the lumbar spine. Regarding plaintiff's mental impairments, the ALJ noted that plaintiff's memory and concentration problems did not appear to be severe during therapy sessions and diminished with medication adjustments; nor were such problems documented during the consultative exams with Drs. Nuttal and Grundle. (Tr. at 1046.) The ALJ could have sensibly concluded that this evidence cut against the credibility of plaintiff's allegations.

29

Third, in her January 2006 decision the ALJ incorporated by reference the analysis contained in her September 2003 decision, stating that she considered the testimony from both hearings. (Tr. at 1045; 1048.) See St. Clair v. Apfel, 215 F.3d 1337 (10th Cir. 2000) (table) (permitting ALJ to rely on previous discussion of credibility); see also Dixon, 270 F.3d at 1178 (upholding decision referencing previous ALJ's decision). In the 2003 decision, the ALJ found plaintiff's allegations inconsistent with the evidence of record, including her activities of daily living, her conservative treatment, and her cancellation of treatment sessions leading to discharge for lack of attendance. The ALJ also noted that plaintiff made inconsistent statements about her level of education. (Tr. at 377; 386.)

Plaintiff argues that if the ALJ had engaged in a broader analysis, she would have found her credible. However, it is well-established that the ALJ need not provide a complete written evaluation of every piece of testimony and evidence. E.g., Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). In any event, none of the omitted evidence seems particularly strong. Plaintiff refers to her work history, but the record shows that her earnings were historically quite limited, even before the alleged disability onset date. (Tr. at 512.) Plaintiff also refers to her December 2002 testimony as to her limited daily activities. However, as the Commissioner notes, the record contains contrary evidence from the relevant time period on this issue. (Tr. at 76-77.) Finally, plaintiff faults the ALJ for not considering her daughter's testimony. However, these statements were essentially redundant of plaintiff's testimony so detailed analysis was not required. See Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) (holding that the ALJ did not err in failing to discuss the claimant's wife's testimony, where the ALJ fully

30

evaluated the claimant's testimony).[20]

Based on all of these factors, I find that the ALJ's credibility determination was not patently wrong, is supported by substantial evidence, and is sufficiently detailed to enable me to trace its path of reasoning.  Schmidt, 395 F.3d at 747; Skarbek v. Barnhart, 390 F.3d 500, 505 (7th Cir. 2004).  Therefore, these is no reversible error on this issue.

## C.    RFC

### 1.    Legal Standard

RFC is the most an individual can do, despite her impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule. In setting RFC, the ALJ must consider both the "exertional" and "non-exertional" capacities of the claimant.  As alluded to above, exertional capacity refers to the claimant's strength-related abilities: sitting, standing, walking, lifting, carrying, pushing and pulling.  Non-exertional capacity includes all work-related functions that do not depend on the individual's physical strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision) activities.   The ALJ's RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence.  The ALJ must also explain how she resolved any material inconsistencies or ambiguities in the evidence.  SSR 96-8p.

Because the first consideration at step four of the sequential evaluation process is

---

[20]This was not a case where the third party testimony filled an important gap or provided crucial corroboration. Cf. Masch v. Barnhart, 406 F. Supp. 2d 1038, 1048 n.9 (E.D. Wis. 2005); Elbert v. Barnhart, 335 F. Supp. 2d 892, 913 (E.D. Wis. 2004).

31

whether the individual can do past work as she actually performed it, RFC should not be expressed initially in terms of the exertional categories of "sedentary," "light," "medium," "heavy," and "very heavy" work. Rather, the ALJ should separately assess the claimant's ability to perform each of the seven strength demands before translating the physical RFC into a category. See, e.g., Blom v. Barnhart, 363 F. Supp. 2d 1041, 1057 (E.D. Wis. 2005).

**2. Analysis**

Plaintiff argues that the ALJ failed to assess her abilities on a function-by-function basis, instead concluding that she could perform unskilled sedentary work with a sit/stand option. While it is true that the ALJ failed to specify each of the seven strength demands, plaintiff fails to demonstrate reversible error. First, the ALJ denied this claim at step five, not step four, so the error does not implicate any decision that plaintiff could perform her past work as she performed it. Second, the ALJ adopted the assessment of Dr. Jankus, which included the required evaluation of plaintiff's physical strength abilities. Third, plaintiff fails to show how any function the ALJ failed to specifically discuss would impact her ability to perform any of the jobs identified by the VE or the ALJ. Therefore, the ALJ's failure to include the required discussion of plaintiff's physical abilities was harmless.

Plaintiff also argues that the ALJ failed to specifically consider all of the mental requirements of unskilled work. However, as I explained in Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1036 n.27 (E.D. Wis. 2004), SSR 96-8p contains no directive requiring the ALJ to first discuss all of the individual components of mental RFC before translating it into categories or otherwise expressing it in shorthand fashion. In any event, as plaintiff herself concedes later in her brief, the ALJ addressed other mental aspects of unskilled work in her hypothetical to

32

the VE.  (Tr. at 1448-49.)  Therefore, any error in this regard was harmless.[21]  The balance of

plaintiff's argument in this section constitutes a rehash of her contention that the ALJ

improperly weighed the medical evidence, a claim I rejected above.

**D.    Step Five**

Finally, plaintiff argues that the ALJ failed to include the sit-stand requirement in her

hypothetical to the VE, and that the VE failed to identify a significant number of jobs.  I address

each argument in turn.

### 1.    Hypothetical Question

A hypothetical question to the VE generally must include all impairments the ALJ

accepts as credible.  See, e.g., Schmidt v. Astrue, 496 F.3d 833, 846 (7th Cir. 2007).  However,

the Seventh Circuit has declined to adopt a rule requiring automatic reversal in case of an

omission.  For example, the court of appeals has affirmed where the VE reviewed the medical

reports before giving her assessment, finding that in such cases the testimony constitutes

substantial evidence despite any omissions from the hypothetical.  Eichstadt v. Astrue, 534

F.3d 663, 668 (7th Cir. 2008).  Similarly, in the present case, the VE considered the sit-stand

option and identified jobs consistent with this limitation during the previous hearing before ALJ

O'Grady (Tr. at 479-80), and the ALJ in her January 2006 decision specifically referenced the

testimony from and the jobs identified at the previous hearing (Tr. at 1048).  Further, the VE

had an opportunity to review the record at both hearings.  Therefore, I find no reversible error

on this issue.

_____

[21]This is not a case, like Craft v. Astrue, 539 F.3d 668, 677-78 (7th Cir. 2008), where the
ALJ's designation of an RFC for "unskilled" work does not permit the court to trace the path of
her reasoning.  The ALJ here took account of the various mental abilities needed for the
identified jobs at step five.

33

### 2. Substantial Number of Jobs

In order to meet his burden at step five, the Commissioner must provide evidence demonstrating that other work the claimant can perform "exists in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(2). In the present case, at the October 2005 hearing, the VE identified 400 production/assembly jobs and 20 machine operator jobs in Wisconsin. (Tr. at 1449.) At the December 2002 hearing, she identified 900 assembly jobs and 400 hand packaging jobs in the Milwaukee area. (Tr. at 480.) Plaintiff cites no case holding that this is not a significant number of jobs, and Seventh Circuit authority suggests that it is. See, e.g., Lee v. Sullivan, 988 F.2d 789, 794 (7th Cir. 1993) (finding 1400 jobs significant, and collecting cases finding 1350, 1266, 850-1000, 500, 174 and 675 jobs a significant number). Further, the VE limited her analysis to the Milwaukee area in the December 2002 hearing and to the state of Wisconsin during the October 2005 hearing. Therefore, I find no reversible error in this point.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 17th day of January, 2009.

/s Lynn Adelman

_____

LYNN ADELMAN
District Judge

34